**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| BHARGAVA GHATTY, SURYANARAYANA RAJU MUDUNURU, and PRAVEEN KOTAGIRI<br><br>Plaintiffs,<br><br>v.<br><br>RAJESH MUDILI, and ALIREZA ZQ NADERI,<br><br>Defendants,<br><br>and<br><br>ALTUMIND INC., a Delaware corporation,<br><br>Nominal Defendant. | C.A. No. 2025-0615-LWW |

## MEMORANDUM OPINION

Date Submitted: August 1, 2025
Date Decided: October 21, 2025

Michael W. McDermott, David B. Anthony & Zachary J. Schnapp, BERGER MCDERMOTT LLP, Wilmington, Delaware; *Attorneys for Plaintiffs Bhargava Ghatty, Suryanarayana Raju Mudunuru, and Praveen Kotagiri*

Michael K. DeSantis & Bradley T. Meyer, OFFIT KURMAN, Wilmington, Delaware; *Attorneys for Defendants Rajesh Mudili and Alireza ZQ Naderi*

**WILL, Vice Chancellor**

This action under 8 *Del. C.* § 225 concerns a dispute over the corporate officers of Altumind Inc., a private Delaware corporation. The plaintiffs—three directors of a five-member board—purported to remove the two defendant directors from their officer roles at a March 20 board meeting. The defendants challenge their removals for numerous reasons, most of which exceed the bounds of this proceeding.

One argument is dispositive. Although the March 20 meeting notice complied with the company's bylaws, it omitted that the defendants' removals would be considered—and even suggested that one would assume an expanded officer role. Equity will not abide such duplicity toward fellow directors. The defendants remain officers of Altumind.

## I. FACTUAL BACKGROUND

The following facts were stipulated to by the parties or found by a preponderance of the evidence at trial.[1]

---

[1] *See* Joint Pre-trial Stipulation and Proposed Order (Dkt. 15) ("PTO"). The trial record includes 13 joint exhibits. *Id.* at 13. Joint exhibits are cited as "JX __."

### A.      Altumind Inc.

Nominal defendant Altumind Inc. (the "Company") provides back-office operations and IT-related consulting and services to corporations.[2]   It was incorporated in Delaware on December 10, 2021.[3]

The parties to this case are stockholders in and the five directors of the Company: plaintiffs Bhargava Ghatty, Suryanarayana Raju Mudunuru, and Praveen Kotagiri, and defendants Rajesh Mudili and Alireza ZQ Naderi.[4]  In April 2022, each of the parties executed a Shareholders' Agreement designating the Company's officers "[u]ntil changed by the board of directors."[5]  Ghatty is co-Chief Executive Officer and President.[6]  Naderi is Senior Vice President of Global Sales.[7]  And Mudili is co-Chief Executive Officer and Treasurer.  Whether Mudili and Naderi retain those officer positions is in dispute.

### B.      The March 20 Meeting Notice

On February 19, 2025, Ghatty emailed the five directors to schedule the Company's "first in-person board meeting."[8]  Noting that it had been "more than 3

---

[2] PTO ¶ 2; JX 3 at 1-2.

[3] JX 1 at 2.

[4] PTO ¶ 1; JX 3 at 1-2.

[5] JX 3 § 3.b.

[6] *Id.* at 3.

[7] *Id.*

[8] PTO ¶ 5; JX 4 at 6.

years since [they had incorporated]," he hoped to discuss "how [they could] bring better governance and transparency in [the] [C]ompany."[9] He suggested a March 20 meeting date.[10]

Thirteen days later, on March 7, Ghatty emailed the directors a notice and agenda for a March 20 meeting in "San Jose, CA (subject to availability of directors)."[11] The agenda included:

1. "Review of [Ghatty's] recent requests for financial statements, bank records, and supporting documentation[;]"

2. "Discussion of alleged unauthorized transactions or approvals[;]"

3. "Proposal for new signatory protocols and centralized finance email[;]"

4. "Proposed recognition and role expansion for [Naderi; and]"

5. "Any additional matters raised by Board members or shareholders in good faith[.]"[12]

A detailed description of the items to be discussed followed.[13] Relevant here, Ghatty stated his belief that the Company's "shareholders and directors [should] have timely and accurate insight into the Company's financial affairs."[14] To that

---

[9] JX 4 at 6.

[10] *Id.*

[11] PTO ¶ 8; JX 4 at 3-6.

[12] JX 4 at 4.

[13] That is, a detailed description of the agenda was included within the same notice email after the high-level agenda.

[14] JX 4 at 4.

end, he proposed to "[t]ransition to a two-signature minimum requirement for any [financial] disbursements, with three (or five) total authorized signers designated by the Board."[15] At the time, Mudili was the only authorized signatory for the Company's Bank of America account.[16]

Ghatty also outlined "[p]otential [a]reas of [c]oncern" regarding unauthorized compensation or withdrawals, hiring practices, and improper use of documents.[17] He wrote: "I emphasize that no final conclusions have been reached. These matters are cited solely to ensure the Board is informed."[18]

Regarding Naderi, Ghatty noted Naderi's "notable contributions to [the Company's] revenue growth and client acquisition efforts."[19] He proposed that Naderi be appointed Chief Revenue Officer and given "[e]nhanced [c]ompensation."[20]

Ghatty expressed his hope that the meeting would "strengthen corporate governance."[21] He cautioned that the notice was not "an accusation of wrongdoing against any individual" but "a formal invitation to clarify and remedy any potential

---

[15] *Id.*

[16] PTO ¶ 3 (discussing the account ending in '6195).

[17] JX 4 at 5.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.* at 6.

4

governance shortfalls."[22]  He invited all directors to submit any "contrary evidence"

and "additional agenda items" ahead of the meeting.[23]

### C.     The Falling Out

The next week, on March 13, Naderi accused Ghatty of "self-dealing by

concealing financial arrangements that bene[fited] [him] personally."[24]     He

mentioned multiple failed buyback attempts of Ghatty's shares.[25]  Naderi offered an

ultimatum: either Ghatty accept a buyback offer by close of business, or Naderi

would "withdraw from the company and file for its dissolution."[26]

Ghatty denied any misconduct or previous buyback proposals.[27]  He invited

Naderi to "place any legitimate concerns on the official Board meeting agenda."[28]

He also reminded Naderi and Mudili that "requests for complete financial records

(bank statements, tax returns, budgets, etc.) have gone unanswered."[29]

---

[22] *Id.*

[23] *Id.* at 5.

[24] *Id.*; *see* PTO ¶ 9 (confirming that all five directors were on this email).

[25] JX 5 at 4.

[26] *Id.*

[27] *Id.* at 1-2; *see* PTO ¶ 9.

[28] JX 5 at 2.

[29] *Id.*

On March 19, Naderi told the Board that he and Mudili would be unable to attend the meeting due to their "tight schedules."[30]  Ghatty responded that their notice of absence—only one day before the meeting—was unacceptable.[31]  Ghatty offered to provide a virtual meeting link upon request.[32]  Alternatively, Ghatty said that he was "prepared to schedule an additional Board meeting" on a proposed future date.[33]  The record does not suggest that Mudili or Naderi requested a link.

### D.     The March 20 Meeting and Its Aftermath

According to the plaintiffs, the March 20 Board meeting went forward as planned, with Ghatty, Kotagiri, and Mudunuru in attendance.[34]  There are no contemporaneous minutes or evidence of the meeting, however.  Resolutions dated April 8 state that at the meeting, "appropriate resolutions were adopted, changing certain officer and signatory roles within the Company."[35]

---

[30] JX 4 at 3.  The time stamp on the email is March 20 at 1:34 pm.  But the plaintiffs note that JX 4 is in Indian Standard Time, which is 12.5 hours ahead of Pacific Standard Time, where Naderi is located.  Pls.' Opening Pre-trial Br. (Dkt. 11) ("Pls.' Opening Br.") 10-11 n.2; *see* JX 4 at 3.

[31] JX 4 at 1.

[32] *Id.*

[33] *Id.* at 2.

[34] Verified Compl. (Dkt. 1) ("Compl.") ¶ 25; *id.* at Ex. D (Board Resolution and Special Directors' Resolution).

[35] JX 6 at 3.  A longer set of resolutions, also dated April 8, is attached to the Complaint.  Compl. Ex. D.  That set was not included in the trial record.  Instead, a shorter set of resolutions was offered.  JX 6 (Limited Board Resolution and Special Directors' Resolution).  The shorter set was purportedly prepared "for use to present to Bank of America and other financial institutions."  Pls.' Opening Br. 8.

6

The April 8 resolutions state that Mudili and Naderi were removed as officers of the Company "effective March 20."[36] They also explained that Mudili and Naderi no longer had "authority or signatory rights" over the Company's "bank accounts, credit cards, and financial instruments."[37] Instead, the resolutions contemplate a two-person signatory requirement for the Company's "banking, financial transactions, and official filings" and designated Ghatty, Kotagiri, and Mudunuru as the only authorized signatories.[38] Kotagiri was also purportedly appointed Treasurer and Corporate Secretary.[39]

On April 10, the plaintiffs' counsel sent the resolutions to Bank of America to transfer authority over the Company's accounts.[40] But on April 11, the defendants' counsel told Bank of America that the resolutions were defective.[41] The plaintiffs assert that Bank of America agreed to facilitate a transfer of signatory authority from Mudili to Kotagiri after Mudili signed off.[42] Mudili purportedly refused to do so.[43]

---

[36] JX 6 at 3; *see* Compl. Ex. D § III.1.

[37] JX 6 at 3.

[38] *Id.* at 3-4.

[39] *Id.* at 4-5 (describing Kotagiri as having these roles); *see* Compl. Ex. D § IV.1 (same).

[40] JX 6 at 1 (noting that the resolutions were first sent to Bank of America by email on April 8).

[41] PTO ¶ 11.

[42] *See* Compl. ¶ 29; Pls.' Opening Br. 8.

[43] Compl. ¶ 30; Answer to Verified Compl. (Dkt. 10) ¶ 30; Pls.' Opening Br. 8. There is no evidence to this effect in the trial record.

### E. This Litigation

On June 3, the plaintiffs filed litigation in this court under 8 *Del. C.* § 225.[44] The parties stipulated to an expedited schedule.[45] On June 18, the defendants answered the complaint.[46]

The plaintiffs filed a pre-trial opening brief on July 3, and the defendants filed an answering brief on July 15.[47] A half-day trial on a paper record was held on August 1.[48] I concluded that post-trial argument was unnecessary and took the matter under advisement at the conclusion of trial.[49]

## II. LEGAL ANALYSIS

Section 225(a) provides that "[u]pon application of any stockholder or director, or any officer . . . the Court of Chancery may hear and determine the validity of any election, appointment, removal or resignation of any director or officer of any corporation."[50] "The purpose of Section 225 is to provide a quick method for review

---

[44] *See* Dkt. 1. Ghatty, Mudunuru, and Kotagiri separately filed a books and records action in the Court of Chancery, which they since dismissed without prejudice. *Ghatty v. Mudili*, C.A. No. 2025-0419-SEM (Del. Ch. June 17, 2025).

[45] Stipulation and Order Governing Case Schedule (Dkt. 8).

[46] Dkt. 10.

[47] *See* Pls.' Opening Br.; Pre-trial Answering Br. of Defs. (Dkt. 12) ("Defs.' Answering Br.").

[48] Dkt. 6.

[49] Dkt. 16.

[50] 8 *Del. C.* § 225(a).

of the corporate election process to prevent a Delaware corporation from being immobilized by controversies about whether a given officer or director is properly holding office."[51] The plaintiffs "bear[] the burden of proving by a preponderance of the evidence that [they are] entitled to relief."[52]

The plaintiffs invoke Section 225 to seek confirmation of "the current officers of Altumind."[53] They ask this court to declare that Mudili and Naderi were "validly removed" from their officer roles.[54] To that end, they seek declarations that the "actions taken at the March 20 [m]eeting" are valid and that the April 8 resolutions are "enforceab[le]."[55] They also assert that Mudili should be ordered to transfer his signatory authority over the Company's financial accounts to Kotagiri.[56]

The defendants raise a range of arguments and affirmative defenses in response. Many contentions fall outside the narrow scope of this Section 225 action.[57] For example, the defendants maintain that certain plaintiffs cannot lawfully be stockholders of the Company under Indian law, and that restrictive covenants in

---

[51] *Box v. Box*, 697 A.2d 395, 398 (Del. 1997).

[52] *In re IAC/InterActive Corp.*, 948 A.2d 471, 493 (Del. Ch. 2008).

[53] Compl. ¶ 33; *see* PTO § V.a.

[54] PTO § III.b; *see* Compl. ¶ 36.

[55] PTO § V.a; *see* Compl. ¶ 36.

[56] *See* PTO § III.d.

[57] *See Genger v. TR Invs., LLC*, 26 A.3d 180, 199-200 (Del. 2011) (explaining that a Section 225 proceeding is *in rem*, and the court's statutory jurisdiction exists "only for the limited purpose of determining the corporations *de jure* directors and officers").

the Shareholders' Agreement were breached.[58]  Their lead argument, however, is both pertinent and dispositive: that notice of the March 20 meeting was inequitable.[59]

## A.  Whether the March 20 Meeting Was Special or Regular

The characterization of a board meeting as regular or special dictates the applicable notice requirements.  The Delaware General Corporation Law (DGCL) permits directors to "hold [] meetings" either within or "outside of this State."[60]  It leaves the specifics to the corporation's bylaws, which can address notice and meeting type.[61]

Article III of the Company's Bylaws recognizes two types of Board meetings. Section 8 provides that "[r]egular meetings of the Board of Directors may be held without notice at such time and at such place as shall from time to time be determined by the Board."[62]  Section 9, by contrast, provides that "[s]pecial meetings of the Board of Directors may be called by the president on three days' notice to each

---

[58] *See* Defs.' Answering Br. 15-17, 18-19, 22-26.

[59] *Id.* at 13-15.

[60] 8 *Del. C.* § 141(g).

[61] *See* 2 *Fletcher Cyclopedia of the Law of Corporations* § 398 (Sept. 2025 Update) ("Regular meetings of the board are those provided for by bylaws . . . . Special meetings are those called by officers authorized to do so, where any special business requires attention between the times of holding the regular meetings.").

[62] JX 2 ("Bylaws") art. III, § 8.

director."[63]   Because a corporation's "bylaws are contracts, [the] rules of contract interpretation apply."[64]

The plain terms of the Bylaws demonstrate that the March 20 meeting was special.  For a meeting to be "regular" under Section 8, it must be held at a time and place "determined by the Board."[65]  This language implies a standing schedule or a formal determination of the full Board to set the meeting.  That is not what happened here.  Rather, Ghatty gave notice of the meeting in his capacity as President, which aligns with the procedure for calling a special meeting under Section 9.[66]

The surrounding facts reinforce this conclusion.  The March 20 meeting was the first Board meeting in the Company's three-year history.[67]  In *Barbey v. Cerego, Inc.*, the court, considering a similar scenario, held that where a board had no "standing rule or schedule setting a time and place at which regular meetings would

---

[63] *Id.* art. III, § 9.

[64] *BlackRock Credit Allocation Income Tr. v. Saba Cap. Master Fund, Ltd.*, 224 A.3d 964, 977 (Del. 2020) (citation omitted); *see also Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) ("Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."); *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins.*, 616 A.2d 1192, 1196 (Del. 1992).

[65] Bylaws art. III, § 8.

[66] JX 4 at 4 ("I write in my capacity as President & Co-CEO of Altumind Inc. to address recent governance concerns . . . and confirm a Board meeting for a full discussion and resolution of [certain] points."); Bylaws art. III, § 9.

[67] JX 4 at 6 ("It's [been] more than 3 years since we incorporated and [we] haven't met in-person.  Let's all have our first in-person board meeting in the month of March or April 2025."); *see* Defs.' Answering Br. 3 ("Since its inception, [the Company] had never held a meeting of the Board.").

11

be held," a meeting called ad hoc by the CEO was special—not regular.[68] The same is true here.

The Bylaws contemplate only two types of meetings: regular or special. Because the March 20 meeting does not meet the definition of regular, it was special.

### B. Whether the Special Meeting Complied with the Bylaws

Having determined that the meeting was special, the next question is whether the notice complied with the Company's Bylaws. I conclude that it did.

Under Article III, Section 9 of the Bylaws, a special meeting may be called by the President with "three days' notice to each director," which may be provided by "electronic transmission."[69] These procedural requirements were satisfied. Ghatty, the Company's President, called the meeting by email on February 19, providing a month of notice.[70]

The defendants respond that the notice is defective for failing to state the meeting's purpose—their removal as officers. But the Bylaw provision they cite for this requirement pertains to meetings of stockholders, not the Board.[71] The Bylaws lack an equivalent provision for special meetings of directors.

---

[68] *Barbey v. Cerego, Inc.*, 2023 WL 6366055, at *7 (Del. Ch. Sept. 29, 2023), *aff'd sub nom.*, *Barbey v. Young*, 319 A.3d 908 (Del. 2024).

[69] Bylaws art. III, § 9.

[70] PTO ¶ 5; JX 4 at 6-7.

[71] *Compare* Bylaws art. II ("Meetings of Stockholders"), *with id.* art. III ("Directors"), *and id.* art. III, §§ 6-11 ("Meetings of the Board of Directors"); *see id.* art. II, § 6 (requiring

Furthermore, Article V, Section 5 of the Bylaws grants the Board broad authority to remove officers "at any time by the affirmative vote of a majority of the Board of Directors."[72] The plaintiffs constituted a three-to-two majority of the Board. The Bylaws do not set any special notice requirements for removal.

## C. Whether Notice Was Equitable

Although the notice technically complied with the Bylaws, it was not necessarily equitable.[73] It was a "bait-and-switch" that concealed the plaintiffs' intention to remove them as officers.[74]

The "core equitable question" presented is "whether all directors are entitled to fair and non-misleading notice of the agenda for a special meeting."[75] Delaware law values the "collaboration that comes when the entire board deliberates on corporate action and when all directors are fairly accorded material information."[76]

---

notice of "the purpose or purposes for which the meeting is called" for stockholder meetings).

[72] *Id.* art. V, § 5.

[73] Defs.' Answering Br. 14-15. *See generally Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971).

[74] Defs.' Answering Br. 19.

[75] *OptimisCorp v. Waite*, 137 A.3d 970, 2016 WL 2585871, at *2 (Del. Apr. 25, 2016) (TABLE).

[76] *Id.* at *3.

It does not endorse board factions developing "Pearl Harbor-like plans" or engaging in "intentional duplicity toward fellow board members."[77]

The plaintiffs' conduct falls in that problematic category. Ghatty's notice stated that the purpose of the March 20 meeting was to review financial statements and address Board-level transparency.[78] Though detailed, the notice misled the defendants by omission and commission. It did not indicate that the Board would consider removing Mudili and Naderi from their officer positions. Worse, it proposed "recognition and role expansion for [Naderi]"—the very person the plaintiffs voted to remove from office.[79]

The hostile exchange between the directors on March 13 cemented the inequity of the plaintiffs' conduct.[80] After that confrontation, the plaintiffs chose to proceed under a notice that no longer reflected their true intentions. Their misdirection concealed a significant corporate action: the planned removal of two senior officers. Our law disfavors such "sandbag[ging]" among directors.[81]

---

[77] *Id.* at *2-3.

[78] JX 4 at 4.

[79] *Id.* at 5.

[80] *See supra* Section I.C.

[81] *OptimisCorp*, 2016 WL 2585871, at *2; *see also Adlerstein v. Wertheimer*, 2002 WL 205684, at *6, *12 (Del. Ch. Jan. 25, 2002) (holding that the approval of an investment proposal and subsequent removal of a CEO at a special meeting "must be undone" because the CEO was kept "in the dark" about the board's plans); *Koch v. Stearn*, 1992 WL 181717, at *5 (Del. Ch. July 28, 1992) (holding that a CEO's removal was "void" because the special meeting agenda "was silent as to any possible consideration" of an

The plaintiffs' counterarguments are unpersuasive. They contend that the notice was sufficient because it highlighted Mudili's performance problems as Treasurer.[82] But an inquiry into an officer's performance is fundamentally different from a vote to remove that officer. Fair notice required, at a minimum, an indication that such a vote would be taken.[83] By failing to provide it, the plaintiffs engaged in a form of "trickery" that deprived the defendants of a meaningful opportunity to prepare a response, consult counsel, or attempt to persuade their fellow directors.[84]

The plaintiffs also suggest that notice is not required where the targeted directors lack the power to block the action—a key fact distinguishing this case from

investment proposal contingent on his removal), *vacated by*, *Stearn v. Koch*, 628 A.2d 44 (Del. 1993), *overruled by*, *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035 (Del. 2014); *cf. Fogel v. U.S. Energy Sys., Inc.*, 2007 WL 4438978, at *4 (Del. Ch. Dec. 13, 2007) (holding in the alternative that a special meeting was "void" where the CEO "was deceived into attending this meeting because the other directors decided to keep secret their plan to terminate his employment"), *overruled by*, *Klaassen*, 106 A.3d at 1035. *Koch* was vacated for mootness because the CEO resigned. *Stearn*, 628 A.2d at 46-47. *Klaassen* only overruled *Koch* and *Fogel* in a limited sense, holding that a board action "taken in violation of an equitable rule" is voidable, not void. *Klaassen*, 106 A.3d at 1047.

[82] *See* Trial Tr. of Aug. 1, 2025 (Dkt. 19) ("Trial Tr.") 53-57; Pls.' Opening Br. 1; *see also* Compl. Ex. D.

[83] JX 4 at 5-6 (describing the meeting as a "formal invitation to clarify and remedy any potential governance shortfalls," where directors would have the opportunity to "present clarifications or contrary evidence").

[84] *See Klaassen*, 106 A.3d at 1046 ("Our courts do not approve the use of deception as a means by which to conduct a Delaware corporation's affairs . . . ."). *Klaassen* held that notice of specific agenda items is not required for a regular board meeting. *Id.* at 1043-44. It did not address notice for special meetings.

*Adlerstein v. Wertheimer.*[85]  That theory was implicitly rejected by *OptimisCorp v. Waite.*[86]  There, the Delaware Supreme Court emphasized that all directors are entitled to "equal treatment" and "fair notice," regardless of their stock ownership and voting power.[87]  Fair notice fosters a genuine deliberative process—a purpose that was subverted here.[88]

---

[85] *See* Trial Tr. 57 (Plaintiffs' Counsel: "The inequity here claimed doesn't bear upon the validity or the authority of the three board members to vote at any time to remove [an officer]."); *see also Adlerstein*, 2002 WL 205684, at *9 (invalidating a board action because directors concealed a plan to strip the chairman of his controlling stockholder status, when the plan would prevent the chairman from exercising his contractual power to remove the other directors and protect his control).

[86] *OptimisCorp*, 2016 WL 2585871, at *2 (expressing discomfort with a faction of a board "intentionally failing to provide [a director] with notice that an important amendment to a stockholders agreement to which he was a party would be on the agenda at a special meeting of the board"); *see* Robert S. Saunders et al., *Folk on the Delaware General Corporation Law* § 141.03 (7th ed. 2025-2 supp.) (interpreting *OptimisCorp* as holding that a director "is entitled to advance notice of the agenda of a special meeting").

[87] *OptimisCorp*, 2016 WL 2585871, at *3; *see also Adlerstein*, 2002 WL 205684, at *10 (rejecting the idea that the inability of directors to convene a special meeting without the plaintiff-CEO rendered "their obligation to give him advance notice . . . even clearer").

[88] *OptimisCorp*, 2016 WL 2585871, at *3 ("[I]t has long been the policy of our law to value the collaboration that comes when the entire board deliberates on corporate action and when all directors are fairly accorded material information."); *see Adlerstein*, 2002 WL 205684, at *9 (explaining that a director's "right to advance notice [at a special meeting] derives from a basic requirement of our corporation law that boards of directors conduct their affairs in a manner that satisfies minimum standards of fairness"); *Fogel*, 2007 WL 4438978, at *3 ("Meetings represent more than a mere technicality; they are a substantive protection.  A proper meeting should be informative and should encourage the free exchange of ideas so that a corporation's directors—through their active, meaningful participation—may keep themselves fully informed and in compliance with their fiduciary duty of care.").

16

Finally, the plaintiffs insist that any defect was cured by their offer to provide the defendants a "virtual link" to attend the meeting.[89] It was not.[90] The harm from a misleading notice is the inability not only to attend, but also to prepare. A virtual link cannot cure a deceptive agenda.

*　　　　*　　　　*

Ghatty's notice of the March 20 meeting concealed that a vote to remove the defendants as officers would occur. Because the notice for the March 20 meeting was inequitable, the actions taken in reliance on it are voidable acts.[91] No valid actions were taken to cure the defect.[92] Naderi and Mudili remain in their respective officer positions.

---

[89] Trial Tr. 14, 54-55; JX 4 at 1.

[90] In fact, the day before the meeting, Ghatty suggested that if Mudili and Naderi were unavailable, he was "prepared to schedule an additional Board meeting on an alternate date." JX 4 at 2. He went forward on March 20 anyway.

[91] The actions are voidable—not void. "The essential distinction between voidable and void acts is that the former are those which may be found to have been performed in the interest of the corporation but beyond the authority of management, as distinguished from acts which are [u]ltra vires, fraudulent or gifts or waste of corporate assets. The practical distinction . . . is that voidable acts are susceptible to cure by shareholder approval while void acts are not." *Michelson v. Duncan*, 407 A.2d 211, 218-19 (Del. 1979) (citation omitted). Here, the defective act invokes a "core equitable question, which is whether all directors are entitled to fair and non-misleading notice of the agenda for a special meeting." *OptimisCorp*, 2016 WL 2585871, at *2. The "source of inequity is . . . the lack of notice." *Cf. Bäcker v. Palisades Growth Cap. II, L.P.*, 246 A.3d 81, 105 (Del. 2021); *see also Klaassen*, 106 A.3d at 1046.

[92] The April 8 resolutions merely restate the actions purportedly taken on March 20. *See* JX 6 at 1. They were neither provided to nor signed by the defendants. *See* 8 *Del. C.* § 141(f).

## III. CONCLUSION

Judgment is entered for the defendants. Mudili is Altumind's Treasurer and co-CEO; Naderi is Senior Vice President of Global Sales. The parties are to confer on and file a proposed form of final judgment by October 24, 2025.